# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

HUMC HOLDCO, LLC, HUMC PROPCO, LLC, HUMC OPCO, LLC, HUDSON HOSPITAL HOLDCO, LLC, CH HUDSON HOLDCO, LLC, HUDSON HOSPITAL PROPCO, LLC, HUDSON HOSPITAL OPCO, LLC, and IJKG OPCO, LLC,

        Plaintiffs,

        v.

MPT OF HOBOKEN TRS, LLC, MPT OF HOBOKEN HOSPITAL, LLC, MPT OF HOBOKEN REAL ESTATE, LLC, MPT OF BAYONNE, LLC, AVERY EISENREICH, WTFK BAYONNE PROPCO, LLC, SB HOBOKEN PROPCO, LLC, ALARIS HEALTH, LLC, and J.C. OPCO, LLC

        Defendants.

HUMC OPCO, LLC,

        Nominal Party,

    and

J.C. OPCO, LLC, on behalf of itself and derivatively on behalf of Nominal Defendants HUDSON HOSPITAL OPCO, LLC d/b/a CHRIST HOSPITAL and CH HUDSON HOLDCO, LLC, MPT OF HOBOKEN TRS, LLC, and MPT OF HOBOKEN HOSPITAL, LLC,

        Counterclaim-Plaintiffs,

        v.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 2019-0972-KSJM

HUDSON HOSPITAL HOLDCO, LLC, and )
HUMC HOLDCO, LLC, )
)
    Counterclaim-Defendants, )
)
  and )
)
VIVEK GARIPALLI, JAMES LAWLER, )
JEFFREY MANDLER, SEQUOIA HEALTH )
MANAGEMENT, LLC, and CAREPOINT )
HEALTH MANAGEMENT ASSOCIATES, )
)
    Third-Party Defendants, )
)
  and )
)
HUDSON HOSPITAL OPCO, LLC d/b/a )
CHRIST HOSPITAL and CH HUDSON )
HOLDCO, LLC, )
)
    Nominal Defendants. )

# MEMORANDUM OPINION

Date Submitted: April 25, 2022
Date Decided: July 29, 2022

Michael Busenkell, Margaret F. England, Bradley P. Lehman, GELLERT SCALI BUSENKELL & BROWN LLC, Wilmington, Delaware; *Counsel for HUMC Holdco, LLC, HUMC Propco, LLC, HUMC Opco, LLC, Hudson Hospital Holdco, LLC, CH Hudson Holdco, LLC, Hudson Hospital Propco, LLC, Hudson Hospital Opco, LLC, and IJKG Opco, LLC*.

Patricia L. Enerio, Jamie L. Brown, HEYMAN ENERIO GATTUSO & HIRZEL LLP, Wilmington, Delaware; Christopher J. Sullivan, NUTTER, MCCLENNEN & FISH LLP, New York, New York; *Counsel for Avery Eisenreich, WTFK Bayonne Propco, LLC, SB Hoboken Propco, LLC, Alaris Health, LLC, and J.C. Opco LLC*.

Thomas A. Uebler, Joseph Christensen, MCCOLLOM D'EMILIO SMITH UEBLER LLC, Wilmington, Delaware; *Counsel for Vivek Garipalli, James Lawler, Jeffrey Mandler, Sequoia Healthcare Management, LLC, and CarePoint Health Management Associates*.

**McCORMICK, C.**

This is the latest installation in a chain of decisions resolving disputes between the owners of three hospitals located in New Jersey.[1] In this decision, one group of owners seeks dismissal of fourteen counterclaims and third-party claims challenging a series of managements agreements executed in 2012, a loan taken out in 2014, a management agreement executed in 2015, and other transactions from an unspecified timeframe. Some of these counterclaims and third-party claims are barred by laches, unsurprisingly. The others simply fail to state a claim. They are all dismissed.

## I.      FACTUAL BACKGROUND

The facts are drawn from the Verified Second Amended Counterclaims and Third-Party Claims, exhibits thereto, and documents they incorporate by reference.[2]

### A.      The Initial Management Structure of Christ Hospital

Nominal counterclaim defendant Hudson Hospital Opco, LLC d/b/a Christ Hospital ("Hudson Opco") operates Christ Hospital in Hudson County, New Jersey. Christ Hospital employs hundreds of doctors, nurses, and staff, and provides critical health care services to tens of thousands of uninsured, under-insured, Medicare, and Medicaid patients annually.

Christ Hospital is one of three hospitals in the CarePoint Health System, which also includes Hoboken University Medical Center ("HUMC") and Bayonne Medical Center

---

[1] *See HUMC Holdco, LLC v. MPT of Hoboken TRS, LLC*, 2020 WL 3872198 (Del. Ch. July 7, 2020); *HUMC Holdco, LLC v. MPT of Hoboken TRS, LLC*, 2020 WL 3620220 (Del. Ch. July 2, 2020); *HUMC Holdco, LLC v. MPT of Hoboken TRS, LLC*, 2019 WL 7194436 (Del. Ch. Dec. 23, 2019).

[2] *See* C.A. No. 2019-0972-KSJM, Docket ("Dkt.") 375 ("SACC").

(together, the "CarePoint Hospitals"). Groups of investors, including third-party defendants Vivek Garipalli, James Lawler, and Jeffrey Mandler (together, the "Founders"), acquired each of the CarePoint Hospitals out of bankruptcy between 2008 and 2012.

Nominal counterclaim defendant CH Hudson Holdco, LLC ("CH Holdco") owns Hudson Opco. The Founders own 75% of CH Holdco through counterclaim defendant Hudson Hospital Holdco, LLC ("Hudson Holdco"), which is the Manager of both CH Holdco and Hudson Opco. Counterclaim and third-party plaintiff J.C. Opco, LLC ("J.C.") owns the remaining 25% of CH Holdco.[3] Avery Eisenreich controls J.C., which does not have an interest in HUMC or Bayonne Medical Center.[4]

---

[3] J.C. alleges that, in 2012, Hudson Holdco owned 75% and J.C. owned 25% of Hudson Opco. J.C. further alleges that, in 2014, Hudson Holdco requested, and J.C. consented to "the insertion of CH Holdco as an intermediate entity between the ownership interests of Hudson Opco and the Christ Hospital operations." *Id.* ¶ 149. This contention is at odds with the above-the-line description of the entity structure and the Key Terms, discussed and defined below, which provide that, upon the purchase of Christ Hospital, Hudson Holdco "will own 75% and J.C. . . . will own 25% of CH Holdco which shall own 100% of [Hudson] Opco." Key Terms (defined *infra* note 5) §§ 2, 4. Also, in its answering brief, J.C. contends that it "owns a 25% interest in CH Holdco, which in turn owns a 25% interest in Hudson Opco." J.C.'s Answering Br. (defined *infra* note 50) at 32. But this is at odds with J.C.'s allegation that "Hudson Opco is wholly owned by CH Holdco." SACC ¶ 29. Because the inconsistencies described in this footnote are immaterial to the legal analysis, the court need not resolve them for the purpose of this decision.

[4] Thus, while J.C.'s Verified Second Amended Counterclaims and Third-Party Claims present numerous allegations regarding transactions involving those CarePoint Hospitals and their management, J.C. has no standing to pursue claims regarding CarePoint Hospitals other than Christ Hospital. This decision, therefore, does not repeat or address those allegations except as necessary to inform facts relevant to the claims at issue.

2

The Founders and Eisenreich, through their respective entities, executed Hudson Opco's original Operating Agreement and CH Holdco's Operating Agreement on July 13, 2012.[5]

Hudson Opco's Operating Agreement provides that Hudson Holdco, as Manager, "shall be responsible for the operation of [Hudson Opco's] business in the ordinary course and . . . shall have all rights, powers and privileges available to a 'manager' under" the Delaware LLC Act.[6]  Section 6.2(a)(vii) of Hudson Opco's Operating Agreement empowered Hudson Holdco, as Manager of Hudson Opco, "[t]o enter into a management

---

[5] *See* Dkt. 397, Unsworn Transmittal Aff. Pursuant to 10 *Del. C.* § 3927 of Megan E. O'Connor in Supp. of Hudson Holdco's Opening Br. ("O'Connor Aff.") Ex. 1 ("Hudson Opco Operating Agreement") at 1; O'Connor Aff. Ex. 4 ("CH Holdco Operating Agreement") at 1.  Exhibit 1 to the O'Connor Affidavit contains several versions of Hudson Opco's Operating Agreement.  The original Operating Agreement begins at page 5 of the Exhibit 1 PDF.  Hudson Opco's Operating Agreement was first amended on the same day it was originally executed, July 13, 2012.  The first amendment appears at page 47 of the Exhibit 1 PDF and replaces the original Exhibit A to the Operating Agreement, containing "Key Terms Relating To Financing For Christ Hospital Acquisition, Financing And Ownership Structure" (the "Key Terms").  This version of the Key Terms is identical to the one attached to CH Holdco's Operating Agreement.  When this decision refers to the Key Terms, this is the version to which it is referring.  Hudson Opco's Operating Agreement was amended a second time in 2014 and a third time in 2017, as reflected at pages 59 and 165 of the Exhibit 1 PDF, respectively.  The second amendment, like the first, updated and amended the Key Terms.  The third amendment, the most recent version, is the only one to update and restate the entire Operating Agreement.  The sections of the original and Third Amended Operating Agreement upon which this decision relies are identical except for Sections 6.1 and 6.2(a)(vii), which is immaterially different for purposes of this decision.  Unless otherwise stated, this decision's citations to Hudson Opco's Operating Agreement refer to the Third Amended Operating Agreement.

[6] Hudson Opco Operating Agreement §§ 2.1(a) & (n), 6.1.

3

agreement with Sequoia HealthCare Management, LLC" ("Sequoia"), a version of which was attached as an exhibit.[7]  Sequoia has a similar agreement with HUMC-related entities.

One of the Founders, Garipalli, indirectly owns 80% of Sequoia, while entities controlled by the other two Founders, Lawler and Mandler, evenly split the remainder. Sequoia is alleged to have no employees and only limited operational expenses, incurring $110,000 and $62,000 in administrative expenses in 2015 and 2016, respectively.  Thus, the Founders are the individuals who provide Sequoia's services and reap its profits. Sequoia's only source of revenue is the management fees it receives from Christ Hospital and HUMC.

CH Holdco's Operating Agreement, which was also executed on July 13, 2012, grants similar powers to Hudson Holdco as Manager of CH Holdco as Hudson Opco's Operating Agreement grants to Hudson Holdco as Manager of Hudson Opco.  For example, Section 6.2(a)(vi) of CH Holdco's Operating Agreement grants Hudson Holdco the power to "enter into, make and perform such contracts, agreements and other undertakings as may be deemed necessary or advisable for the conduct of the affairs of" CH Holdco,[8] while Section 6.2(a)(viii) of Hudson Opco's Operating Agreement grants Hudson Holdco the same power over Hudson Opco.[9]  Similarly, Section 6.2(a)(iii) of CH Holdco's Operating Agreement empowers Hudson Holdco "[t]o take such actions and incur such expense on

_____

[7] *Id.* § 6.2(a)(vii).

[8] *See* CH Holdco Operating Agreement § 6.2(a)(vi); Hudson Opco Operating Agreement § 6.2(a)(viii).

[9] *See* Hudson Opco Operating Agreement § 6.2(a)(viii).

4

behalf of [CH Holdco] as may be necessary or advisable in connection with the conduct of the affairs of" CH Holdco,[10] while Section 6.2(a)(iii) of Hudson Opco's Operating Agreement grants Hudson Holdco the same power over Hudson Opco.[11] Section 6.2(a)(v) of CH Holdco's Operating Agreement empowered Hudson Holdco "[t]o enter into the CH [Holdco] Management Agreement in the form attached" as an exhibit.[12]

Each operating agreement attaches an "Exhibit A" titled "Key Terms Relating To Financing For Christ Hospital Acquisition, Financing And Ownership Structure" (the "Key Terms").[13] Section 10 of the Key Terms, labeled with the header "Management Agreement/Management," provides that Hudson Opco was "to enter into a management agreement with Vivek [Garipalli] entity ('Sequoia Management') to pay a monthly management fee."[14] Section 10 further provides that Hudson Opco "shall also enter into a management agreement with CH Holdco" and lays out the distribution scheme for the

---

[10] CH Holdco Operating Agreement § 6.2(a)(iii).

[11] *See* Hudson Opco Operating Agreement § 6.2(a)(iii).

[12] CH Holdco Operating Agreement § 6.2(a)(v). The original version of Hudson Opco's Operating Agreement did not mention the CH Holdco Management Agreement, but the Third Amended Operating Agreement granted Hudson Holdco the power to enter into that agreement. *See* Hudson Opco Operating Agreement § 6.2(a)(vii). Section 4(c) of the CH Holdco Management Agreement grants CH Holdco "the power and authority to make all reasonable contracts necessary to carry out the duties conferred or imposed upon [CH Holdco] by this Agreement, including without limitation the authority to execute all necessary agreements on behalf of and to operate" Hudson Opco. O'Connor Aff. Ex. 5 (CH Holdco Mgmt. Agreement) § 4(c).

[13] *See supra* note 5.

[14] Key Terms § 10.

management fees Hudson Opco would pay Sequoia and CH Holdco under the management agreements.[15]

On the same day that the Founders and J.C. executed Hudson Opco's and CH Holdco's Operating Agreements, Hudson Opco entered into management services agreements with Sequoia (the "Sequoia Management Agreement")[16] and CH Holdco (the "CH Holdco Management Agreement") pursuant to the Key Terms.[17]

The Sequoia Management Agreement provides that Sequoia "will undertake the general day-to-day supervision and management" of Christ Hospital and "provide sufficient and qualified management personnel with the necessary expertise . . . [t]o manage, oversee and direct" Christ Hospital's operations.[18] Further, Sequoia agreed "[t]o hire, promote, discharge, oversee, manage and supervise the work of [Christ Hospital]'s chief executive officer, chief financial officer, department heads, medical directors and all operating and service employees performing services in and about" Christ Hospital on the hospital's behalf.[19]

---

[15] Section 11 of the Key Terms provides that an entity "managed, controlled or affiliated with" Garipalli "shall use its best efforts to cause its affiliates to manage [Hudson] Opco to maximize [Hudson] Opco's value." *Id.* at 32, § 11.

[16] Garipalli signed the Sequoia Management Agreement on behalf of each counterparty. O'Connor Aff. Ex. 2 (Sequoia Mgmt. Agreement) at 22.

[17] The Founders signed the CH Holdco Management Agreement on behalf of each counterparty. CH Holdco Mgmt. Agreement at 6.

[18] Sequoia Mgmt. Agreement art. III & § 3.1(i).

[19] *Id.* § 3.1(ii). Section 3.7 provides that "[a]ll expenditures of every kind required or permitted by [Sequoia] under this Agreement are for [Hudson Opco]'s account," and that Sequoia "is authorized by [Hudson Opco] to pay all" such expenditures from Christ Hospital's funds. *Id.* § 3.7. These expenditures exclude "the salaries and benefits of

6

### B.    The Management Fee Structure

According to the Key Terms, Palisades Avenue Financing, LLC ("Palisades"), an entity jointly owned by Garipalli and Eisenreich, funded the acquisition of Christ Hospital with loans (the "Palisades Loans").[20]   Sequoia and CH Holdco's management fees were intended to repay the Palisades Loans before being paid to the Founders' entities.

Under Section 10 of the Key Terms, Sequoia agreed to distribute its management fees, which were capped at four percent of Christ Hospital's net patient revenues, "to Palisades, which shall treat such distributions as a reduction of the principal amount of the Palisades Loans."[21]   Palisades, in turn, would distribute one-third of those payments to an Eisenreich entity and two-thirds to a Garipalli entity, although Sequoia was entitled to hold those two-thirds and consider them a reduction of Garipalli's share of the Palisades Loans.

The structure of the CH Holdco management fee is slightly more complicated because it depends on the interplay of three documents.    Under the CH Holdco Management Agreement, Hudson Opco agreed to pay CH Holdco "a management fee equal to the lesser of (a) ninety-five percent (95%) of [Hudson Opco]'s net income, or (b) the amount minimally necessary for [Hudson] Opco to maintain its debt covenant ratios with its lenders."[22]   CH Holdco's Operating Agreement provides that "any management fee received by [CH Holdco] pursuant to the CH [Holdco] Management Agreement shall

---

[Sequoia]'s officers and home office staff, as well as [Sequoia]'s home office overhead." *Id.*

[20] *See* Key Terms at 32–33.

[21] *Id.* § 10.

[22] CH Holdco Mgmt. Agreement § 5.

7

be treated as Excess Cash under, and distributed pursuant to the Key [Terms]."[23]  The Key Terms provide that Excess Cash such as the CH Holdco management fee would, like the Sequoia management fee, be used to pay down the Palisades Loans until they were paid off, after which the fee would be distributed to Hudson Opco's members, i.e., CH Holdco, and in turn to CH Holdco's members.[24]

Christ Hospital paid Sequoia approximately $30 million in management fees from 2013 to 2016, and approximately $20 million from 2017 to 2019.[25]  Each year, Christ Hospital paid Sequoia between approximately $6 million and $8 million in fees, exceeding $8 million only once, in 2016.[26]  The allegations do not reveal when the Palisades Loans were repaid, nor how much Eisenreich received under the management fee arrangement.

## C.    Sequoia Takes Out A Loan And Garipalli Creates Clover.

On July 17, 2014, Sequoia executed a loan agreement with a financial institution in New Jersey for $60 million (the "Sequoia Loan").  As collateral, Sequoia pledged and assigned its future income from its sole revenue source, the management fees it receives from Christ Hospital and HUMC.  Sequoia and three entities in the CarePoint Health System structure, including Christ Intermediate Holdco, LLC, which owns and is the sole member of Hudson Holdco, agreed to be ultimately responsible for ensuring that the loan obligations would be satisfied.

---

[23] CH Holdco Operating Agreement § 4.3.

[24] Key Terms §§ 1(a)–(b).

[25] SACC ¶¶ 10, 51, 69.

[26] *Id.* ¶ 51.

Upon closing the Sequoia Loan, Sequoia transferred $54.4 million of the loan proceeds as "dividends" to entities linked to the Founders.[27] The "insurance side" of the CarePoint Health System, the CarePoint Health Plans, used $20–25 million of the loan proceeds to pay off intercompany debt to Bayonne Medical Center.[28] Once this debt was paid, the CarePoint Health Plans rebranded and reorganized as a new entity, Clover Health Investments, Corp. ("Clover").[29] The alleged facts do not state how the rest of the Sequoia Loan proceeds were used or distributed.

Garipalli, Clover's CEO, co-founded Clover on the same day, July 17, 2014. Clover provides health insurance to the CarePoint Hospitals' patients, among other hospitals nationally, as a Preferred Provider Organization (PPO) plan with a Medicare contract and describes itself as "one of the fastest growing Medicare Advantage companies in the country."[30] Clover has been publicly traded since early 2021.[31]

Medicare Advantage companies receive a fixed amount per patient from Medicare, then pay health care providers for services rendered to patients. J.C. claims that Garipalli

---

[27] *Id.* ¶ 101.

[28] *Id.* ¶ 104.

[29] *See* Dkt. 225 Ex. C ("SCI Report") at 24 (Garipalli testifying to the SCI that "[W]e needed to raise outside capital. You cannot raise outside capital as long as the insurance company owed money, so we had to pay off that loan before anyone would want to invest capital into what became Clover").

[30] SACC ¶ 119.

[31] *See* O'Connor Aff. Ex. 10 (Clover's Form S-1 Registration Statement Under The Securities Act of 1933).

has used his control over Clover and the CarePoint Hospitals to benefit Clover at the expense of the CarePoint Hospitals' minority investors.

On this point, J.C. alleges the following:

- "Upon information and belief, Clover contracted with the CarePoint Hospitals at a significantly reduced rate for medical services that were provided to Clover members," which "diverted funds from the CarePoint Hospitals, and its minority partners, to the benefit of Clover;"[32]

- "Upon information and belief, Garipalli caused Clover to issue automatic denials for claims for medical services performed by the CarePoint Hospitals,"[33] which "had the effect of causing the CarePoint Hospitals to expend additional effort in order to collect monies rightfully owed by Clover;"[34] and

- "Upon information and belief, including based upon statements by former CarePoint employees, the CarePoint Hospitals did not seek to collect a significant amount of the monies owed by Clover to the CarePoint Hospitals," "despite the fact that Sequoia . . . was responsible for ensuring that Christ and Hoboken Hospitals collected all monies owed . . . ."[35]

**D.    The CarePoint Hospitals Engage CP Management.**

On January 1, 2015, Hudson Opco entered into a Professional Services Agreement (the "CP Agreement") with CarePoint Health Management Associates, LLC ("CP

---

[32] SACC ¶ 132.

[33] *Id.* ¶ 134.

[34] *Id.* ¶ 133.

[35] *Id.* ¶ 136.

Management").[36]  CP Management is wholly owned by another entity affiliated with the Founders, Sequoia Healthcare Services, LLC.[37]

The entities that control HUMC and Bayonne Medical Center entered into similar contracts with CP Management on the same day.  Unlike Sequoia, CP Management has hundreds of employees, paying more than $30 million in salary and wages in 2016.  CP Management and Hudson Opco are "Affiliates" as that term is defined in the CP Agreement.[38]

According to the CP Agreement's recitals, Hudson Opco "does not maintain the full internal capability to perform all of the managerial, strategic, advisory, operational, financial, administrative, and other transactional support functions which are necessary to operate" Christ Hospital.[39]  The CP Agreement provides that CP Management will "supervise and manage the entire business and operations of" Hudson Opco, including "accounting, purchasing, quality assurance, marketing, human resources and personnel matters, information systems, cash management, billing and collection, risk management, general management, finances, medical and non-medical personnel and all staffing, equipment, furnishings, inventory and supplies, legal matters, tax matters and reimbursement matters . . . ."[40]

---

[36] O'Connor Aff. Ex. 8 (CP Agreement).

[37] SCI Report at 11, 13.

[38] CP Agreement at 1–2.

[39] *Id.* at 1.

[40] *Id.* § 2.1(c).  The CP Agreement incorrectly identifies Hudson Opco as a New Jersey limited liability company, rather than a Delaware one, and grants CP Management "all of

The CP Agreement further provided that CP Management would "provide the management personnel (including, but not necessarily limited to [the] Chief Operating Officer and Chief Medical Officer), each of whom will be and remain an employee of [CP Management] or its Affiliates."[41] Hudson Opco agreed to pay CP Management 30% of CP Management's annual operating budget as a professional services fee, as did each of the entities controlling HUMC and Bayonne Medical Center.[42]

None of the parties challenge the quality of CP Management's services or assert that CP Management has failed to provide these services.

### E.  Information Rights

Members of CH Holdco possess broad information rights. Section 9.1 of CH Holdco's Operating Agreement provides that "each Member shall have the right upon reasonable notice given to [CH Holdco] to inspect, extract and copy [CH Holdco's] books during regular business hours of [CH Holdco]."[43] Section 9.1 of Hudson Opco's Operating Agreement grants Hudson Opco's members identical rights.[44]

J.C. alleges that, "[f]rom 2013 to the present, [J.C.] made multiple requests to Hudson Holdco, in its capacity as manager of CH Holdco and Hudson Opco, to inspect the books and records of CH Holdco and Hudson Opco, as provided under the Operating

---

the rights and powers which may be possessed by a manager of a [New Jersey] limited liability company." *Id.* § 2.1(b).

[41] *Id.* § 4.1(b).

[42] *Id.* § 3.1; SACC ¶ 58; SCI Report at 8.

[43] CH Holdco Operating Agreement § 9.1.

[44] *See* Hudson Opco Operating Agreement § 9.1.

12

Agreements," but that "[o]n each and every occasion, Hudson Holdco prevented [J.C.] from inspecting the books and records by refusing to permit access and inspection."[45]

In audited financial statements for the years ending December 31, 2013 and 2014, Hudson Opco disclosed its relationship with Sequoia.[46] Hudson Opco's audited financial statements for the years ending December 31, 2014 and 2015 included a near-identical disclosure, updated only to reflect Christ Hospital's payment of $7,876,840 in management fees to Sequoia in 2015.[47]

The 2014–15 audited financial statements reflect an increase in 2015 of more than $30 million for the line item "Supplies and other expenses."[48] Notably, 2015 was the first year that CP Management provided management services to the CarePoint Hospitals.

J.C. alleges that, "in or around July of 2015," it received "a financial statement" reflecting this increase.[49] In briefing, J.C. adjusted this timeline and stated that it received the financial statement on June 29, 2015.[50] While J.C. appeared to refer to an audited

---

[45] SACC ¶ 68.

[46] Under Section 10, "Related Party Transactions," subsection (b), "Management Fees," the financial statements included the following statement: "In exchange for providing certain general and administrative services related to its operations, the Hospital pays CH Hudson Holdco and a related party, [Sequoia], management fees. In accordance with the management agreement, the Hospital will pay [CH Holdco] management fees only to the extent that it will not violate covenant requirements. For the years ended December 31, 2014 and 2013, the Hospital did not report management fees to [CH Holdco] and reported management fees only for Sequoia in the amount of $7,108,447 and $6,446,522, respectively." O'Connor Aff. Ex. 6 (2013–14 Fin. Statements) § 10(b).

[47] O'Connor Aff. Ex. 9 (2014–15 Fin. Statements) § 10(b).

[48] *Id.* at 3, 5.

[49] SACC ¶ 62.

[50] Dkt. 408 ("J.C.'s Answering Br.") at 27–28.

financial statement when making this allegation,[51] J.C. further clarified in briefing that it was not referring to Hudson Opco's April 29, 2016 audited financial statements for the years ending December 31, 2014 and 2015, which did not exist in July 2015.[52]

According to J.C., after it received this unaudited financial statement in June or July 2015 reflecting a $30 million increase for the full 2015 year, it immediately inquired with an unnamed officer of the CarePoint Hospitals as to the reason for this increase. While J.C. twice identifies this officer as the CarePoint "Hospitals' chief operating officer" in its pleading, it goes on to identify this officer as the "chief financial officer" in the rest of its pleading and clarified in briefing that it was referring to the chief financial officer.[53]

J.C. alleges that the increase in "Supplies and other expenses" was attributable to the management fees Christ Hospital was paying CP Management. J.C. avers that, in response to its inquiry, the CarePoint Hospitals' CFO "falsely represented to [J.C.] that the increased expense resulted from 'growth in revenue as robotic supplies can be expensive.'"[54] J.C. further claims that the CFO "falsely represented to [J.C.] that Christ Hospital had 'incurred some upfront costs with the HOPD sites prior to them being fully operational. In addition, we are spending more to maintain and improve the facility.

---

[51] *See* SACC ¶ 65 ("[J.C.] justifiably relied on the audited financial statement together with the representations made by the Hospitals' chief financial officer regarding the increased spend for 'supplies and other expenses.'").

[52] J.C.'s Answering Br at 29.

[53] SACC ¶¶ 62–65; J.C.'s Answering Br. at 29.

[54] SACC ¶ 63.

Finally, we leased several new pieces of medical equipment in late 2014 on operating leases.'"[55]

In briefing, J.C. stated that the exchange began on June 30, 2015, via email, which J.C. did not attach to either its pleading or its brief.[56] Nonetheless, J.C. maintains that "the Hospitals' chief financial officer provided [J.C.] with a litany of false information in order to conceal the [CP Agreement] from [J.C.], prevent [J.C.] from discovering the existence of the [CP Agreement] and the duplicate 'management fees' being paid by Christ Hospital to both [CP Management] and [Sequoia]."[57]

Hudson Opco's audited financial statements for the years ended December 31, 2017 and 2016 are dated as of April 27, 2018 and were provided to J.C. around that time. Under Section 10, "Related Party Transactions," subsection (b), "Management Agreement," the financial statements included the following disclosure:

> The Hospital has entered into a management service agreement with a related party, [Sequoia]. The manager is responsible for the operations and economics of the Hospital in compliance with all applicable laws, statutes, ordinances and regulations. In return for these services the Hospital pays a management fee of 4% of patient service revenue. The management fees were $7,571,200 and $8,525,229 in 2017 and 2016, respectively.

---

[55] *Id.*

[56] *See* J.C.'s Answering Br. at 6, 27–28.

[57] SACC ¶ 64.

15

> *Certain other expenses, shared among the Hospital and certain of its affiliates, are incurred by a separate company and are allocated accordingly.*[58]

J.C. alleges that Hudson Holdco's refusal to permit books and records access since 2013 and the chief financial officer's false representations in 2015 prevented J.C. from discovering that CP Management was providing management services to the CarePoint Hospitals until New Jersey regulators published a report in 2019, which is discussed in the next section.

### F.    The SCI Report

On March 19, 2019, the New Jersey State Commission of Investigation issued a report addressed to New Jersey's governor and legislature recommending changes to Department of Health ("DOH") rules regarding financial disclosures in the health care industry (the "SCI Report").[59]  The SCI Report highlighted issues for the New Jersey DOH to "be aware of as it develops new rules for ensuring effective scrutiny of hospital ownership, identifying and addressing conflicts of interest and other potential abuses, and providing for adequate financial disclosure and transparency in the public's best interest."[60]

The SCI Report focused on the CarePoint Health System and noted at the outset "that these formerly bankrupt hospitals could have closed if not for the actions, including investments and assumption of pre-existing liabilities, by the CarePoint Health hospitals'

---

[58] O'Connor Aff. Ex. 7 (2016–17 Fin. Statements) § 10(b) (emphasis added).

[59] *See generally* SCI Report.

[60] *Id.* at 1.

ownership in acquiring and improving the hospitals."[61]   The SCI Report also noted that "these for-profit hospitals remain operational and servicing patients, including many who do not have the means to pay for treatment," and that the CarePoint Health System has led community initiatives including "the creation of neighborhood health centers."[62]

The SCI Report's first section was entitled "Related Parties, Management Fees and Ownership," and its first subsection was entitled "Significant and Questionable Management Fees and Allocations Paid to Related Entities."[63]   That subsection begins by breaking down the $58.8 million in fees that Christ Hospital and HUMC paid Sequoia and the $98.8 million that Bayonne Medical Center paid another entity, similar to Sequoia in ownership and structure, for the years 2013 to 2016.[64]   The SCI Report went on to describe the ownership and fee structure of the CarePoint Health System, which this decision has already done and does not repeat.   The SCI Report also noted that Garipalli signed the Sequoia Management Agreement on behalf of each counterparty, that Sequoia has no other clients, and that many of the interrelated entities in the CarePoint Health System share addresses.[65]

The SCI Report found that, while the Founders provided "management services" to Christ Hospital through Sequoia, "the extent of the services" was "unclear."[66]   Garipalli

---

[61] *Id.* at 4.

[62] *Id.*

[63] *Id.*

[64] *Id.*

[65] *Id.* at 14–15.

[66] *Id.* at 6.

testified before the SCI "that the payments from the hospitals to . . . [Sequoia] are 'incentive payments' structured such that the payments are to be made only if the hospitals are successful."[67] Garipalli and Lawler testified that their involvement in the day-to-day oversight of the CarePoint Hospitals has decreased over the years, and Garipalli "acknowledged that by 2015/2016, he was, to some extent, reaping the benefits of his earlier work."[68]

Mandler "testified that since stepping down from his position as the system CEO (a position for which he was separately compensated), he remains a board member and still deals with board-related issues," as do Garipalli and Lawler.[69] Unlike Garipalli and Lawler, "Mandler testified that his own '24/7' work for the hospitals continues."[70]

The SCI Report's next subsection, "A Third-Party Contract for Management Services," discussed CP Management.[71] The SCI Report noted that the Sequoia Management Agreement and the CP Agreement both impose responsibilities on the management companies regarding a broad array of hospital operations. For example, the Sequoia contracts with Christ Hospital and HUMC "state that it will provide management personnel to hire, oversee and supervise various hospital executives, including the chief financial officer," while CP Management "employs an individual to act in the capacity of

---

[67] *Id.* at 7.

[68] *Id.*

[69] *Id.*

[70] *Id.*

[71] *Id.* at 7–8.

a chief financial officer for the system, while the hospitals, on their own, have not had such a staff position for at least parts of recent years."[72]

Garipalli testified that the Founders "are responsible for setting the entire hospital business strategy, i.e. putting together a team, executing on that, monitoring in terms of board meetings, and determining what key decisions need to be made each year," and further that CP Management "is providing the actual operational services as it is 'responsible for the execution of the strategy that we set.'"[73] Garipalli also "stated that he interacts with individuals from CarePoint on a weekly basis, sometimes daily depending upon the issues that arise."[74]

Recall that, at a high level, the purpose of the SCI Report was to encourage DOH and New Jersey lawmakers to improve DOH's authority and capability to review New Jersey hospitals' finances. At the end of its first section, the SCI Report stated that "[a]lthough these circumstances are not, in and of themselves, evidence of wrongdoing,

---

[72] *Id.* at 8.

[73] *Id.* (quoting Garipalli). The SCI Report noted that "records, i.e. audited hospital financial statements submitted to DOH, demonstrate that DOH has been on notice for years that Christ Hospital has been paying millions of dollars in management fees to [Sequoia] and that DOH has similarly been on notice with respect to related-party management fees paid by [HUMC]." *Id.* at 21. "However, the money flow from the hospitals to [Sequoia's] owners is not apparent from the hospitals' financial statements because such statements do not set forth how much money was distributed by [Sequoia] to [its] owners." *Id.* at 23. Further, "despite the fact that the ownership of [CP Management] overlaps with the ultimate ownership of the three hospitals, fees to [CP Management] are not, at least explicitly, disclosed in the audit reports of the hospitals." *Id.* at 9.

[74] *Id.* at 8.

19

they do indicate the potential interrelationship of the companies involved and highlight the need for further review."[75]

To this point, the SCI "found no evidence" that DOH's knowledge of Sequoia's related-party management fees "ever triggered DOH to utilize its existing regulatory authority to obtain [Sequoia]'s financial statements."[76]  Indeed, "although the overlap between the ultimate owners of [Sequoia] and the now-CarePoint [Hospitals] was disclosed to DOH as part of the applications process pertaining to the acquisition of [HUMC] in 2011, it is unclear to what degree this information was tracked and understood by DOH staff."[77]

Thus, the SCI Report concluded with a list of recommendations that the SCI believed would improve the DOH's ability to review hospitals' finances, such as by modifying the DOH's "Early Warning System" to capture and track a broader array of related-party transactions.[78]

### G. This Litigation

On December 4, 2019, Hudson Holdco, CH Holdco, Hudson Opco, and various affiliates filed suit against Eisenreich, J.C., WTFK Bayonne Propco, LLC, SB Hoboken Propco, LLC and Alaris Health, LLC (the "Eisenreich Defendants") and other defendants.

---

[75] *Id.* at 15; *see also id.* at 9 ("Although these circumstances do not necessarily establish impropriety, they do – particularly in combination – highlight areas in which DOH should inquire to ascertain and confirm the precise nature of the services being provided and assess any potential risks to the ultimate financial viability of the affected hospitals.").

[76] *Id.* at 21.

[77] *Id.* at 25.

[78] *Id.* at 28–29.

Their primary claim was for tortious interference with a right of first refusal contained in the operating agreement for the entity operating HUMC.[79]

J.C. filed counterclaims and third-party claims on January 15, 2020.[80] J.C. last amended its pleading on May 7, 2021 (the "Counterclaims").[81] Hudson Holdco, as the counterclaim defendant, and the Founders and Sequoia, as third-party defendants (collectively, "Defendants"), moved to dismiss the Counterclaims on May 21, 2021.[82] The parties finished briefing the motions as of September 24, 2021,[83] and the court held oral argument on the motions on January 18, 2022.[84] The court requested supplemental briefing on March 30, 2022,[85] which the parties completed by April 25, 2022.[86]

---

[79] *See generally* Dkt. 1.

[80] Dkt. 77. The same day, the Eisenreich Defendants moved for judgment on the pleadings, which the court denied on July 7, 2020. Dkt. 78; Dkt. 212. On October 20, 2020, the plaintiffs filed their second amended verified complaint. Dkt. 259. On October 23, 2020, the Eisenreich Defendants filed their answer to the second amended verified complaint and J.C.'s verified amended counterclaims and verified third-party claims, concurrently refiling a pending motion for summary judgment. Dkt. 266; Dkt. 267. The court denied the summary judgment motion on January 20, 2021. Dkt. 353. The counterclaim and third-party defendants filed opening briefs in support of motions to dismiss J.C.'s then-operative claims on January 29, 2021. Dkt. 343; Dkt. 344; Dkt. 345; Dkt. 346; Dkt. 348.

[81] *See generally* SACC.

[82] Dkt. 382; Dkt. 384.

[83] Dkt. 395 (Founders' Opening Br.); Dkt. 396 (Holdco's Opening Br.); J.C.'s Answering Br.; Dkt. 410 (Holdco's Reply Br.); Dkt. 412 (Founders' Reply Br.).

[84] Dkt. 434 ("Oral Arg. Tr.").

[85] Dkt. 435.

[86] Dkt. 439 (Holdco & Founders' Suppl. Opening Br.); Dkt. 440 (J.C.'s Suppl. Opening Br.); Dkt. 446 (Holdco & Founders' Suppl. Reply Br.); Dkt. 447 (J.C.'s Suppl. Reply Br.).

## II. LEGAL ANALYSIS

Defendants seek dismissal under Court of Chancery Rules 8(a), 9(b), and 12(b)(6), and Sequoia also seeks dismissal for lack of personal jurisdiction under Rule 12(b)(2).

The Counterclaims assert a staggering fourteen counts challenging various arrangements of Hudson Holdco, the Founders in their individual capacities, and Sequoia. To simplify the analysis, this decision groups the Counterclaims according to the conduct they challenge. Collectively, the Counterclaims challenge four categories of conduct: (i) the payment of management fees to Sequoia (the "Sequoia Fees") and the concealment of those fees;[87] (ii) the retention of CP Management and the concealment of that retention;[88] (iii) taking on the Sequoia Loan to establish Clover;[89] and (iv) the failure to collect debts Clover owes and the discounts Clover's members receive (the "Clover Benefits").[90]

Because J.C. asserts the conspiracy theory as a basis for personal jurisdiction over Sequoia, and that analysis overlaps considerably with the arguments advanced under Rules 9(b) and 12(b)(6), this decision addresses Sequoia's Rule 12(b)(2) arguments and the aiding-and-abetting counts asserted against Sequoia last.

---

[87] SACC ¶¶ 153 (Count I), 161 (Count II), 173 (Count IV), 188 (Count VII), 197 (Count IX).

[88] *Id.* ¶¶ 153 (Count I), 173 (Count IV), 188 (Count VII), 197 (Count IX).

[89] *Id.* ¶¶ 202–05 (Count X), 221–22 (Count XII), 226 (Count XIII).

[90] *Id.* ¶¶ 161 (Count II), 189 (Count VII), 211–16 (Count XI), 223 (Count XII), 226 (Count XIII), 233–34 (Count XIV).

## A. Failure To State A Claim

"[T]he governing pleading standard in Delaware to survive a motion to dismiss is reasonable 'conceivability.'"[91] On a Rule 12(b)(6) motion, the court accepts "all well-pleaded factual allegations in the Complaint as true, [and] accept[s] even vague allegations in the Complaint as 'well-pleaded' if they provide the defendant notice of the claim."[92] The court "is not, however, required to accept as true conclusory allegations 'without specific supporting factual allegations.'"[93] The court draws "all reasonable inferences in favor of the plaintiff, and den[ies] the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[94]

### 1. The Counterclaims Challenging The Sequoia Fees Are Barred By Laches.

J.C. claims, under a variety of legal theories, that Defendants are liable for causing the Sequoia Fees to be paid although they knew that Sequoia was not providing any unique management services to Christ Hospital. J.C. alleges that, until the SCI Report was published in 2019, J.C. "reasonably understood and believed that [Sequoia] was providing legitimate and fulsome management services to Christ Hospital."[95] J.C. avers that Sequoia is not "a real hospital management company," but rather "a shell entity with no employees"

---

[91] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 537 (Del. 2011) (citation omitted)

[92] *Id.* at 536 (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002)).

[93] *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006) (quoting *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 65–66 (Del. 1995)).

[94] *Cent. Mortg.*, 27 A.3d at 536 (citing *Savor*, 812 A.2d at 896–97).

[95] SACC ¶ 50.

that provided "no management services."[96] Thus, J.C. claims that "[f]rom 2012 until the present time, the [Founders] have systematically carried out a scheme to defraud [Christ Hospital] out of tens of millions of dollars through a pattern of tortious and illegal conduct that includes causing the hospital to pay [the] fictitious" Sequoia Fees.[97]

Defendants argue that any claims challenging the Sequoia Fees should be dismissed under the doctrines of acquiescence and of laches.

At first blush, the doctrine of acquiescence seems like a strong defense. Acquiescence "is based upon the rule that equity will not permit a complainant to stultify himself by complaining against acts in which he participated or in which he has demonstrated his approval by sharing in the benefits—even though the suit might otherwise be meritorious."[98] The core of J.C.'s claim is that Sequoia is not a "real hospital management company" and has not provided any management services to Christ Hospital in exchange for the Sequoia Fees.[99] The Key Terms, however, provide that J.C.'s principal, Eisenreich, was to receive one-third of the Sequoia Fees in order to pay down the Palisades Loans, despite never himself providing any management services.

During oral argument, J.C.'s counsel dismissed this fact as immaterial, asking:

> So what? What does that have to do with the concealment of the fact that Sequoia wasn't managing the hospital, wasn't providing qualified personnel for the hospital, wasn't doing any of the things that are required by the

---

[96] *Id.* ¶¶ 6, 70.

[97] *Id.* ¶ 1.

[98] *Wechsler v. Abramowitz*, 1984 WL 8244, at *2 (Del. Ch. Aug. 30, 1984).

[99] *See* SACC ¶¶ 6, 70.

24

Sequoia management contract? [J.C.] wasn't sharing in management fees. The parties agreed that the individual defendants couldn't start paying themselves through Sequoia . . . . until both sides had been repaid their initial equity investment. According to the SCI, the Sequoia fee for 2013 was paid in full, [$6.5] million. That fact does not suggest that [J.C.] was informed about what was essentially a fraud. It doesn't have anything to do with anything.[100]

The court responds to these rhetorical questions with another: If J.C. thought that Sequoia was receiving the Sequoia Fees in exchange for services rendered by a theoretical management services company with extensive operations and a sizeable workforce, why would the parties agree that such "fee" should be diverted wholesale to the Founders, and Eisenreich, to repay the Palisades Loan?

Although applying the acquiescence doctrine to dismiss claims based on the Sequoia Fees has initial appeal, the doctrine also seems to invite factual disputes concerning the degree of Eisenreich's knowledge and whether it can be imputed to J.C. Arguments based on acquiescence, therefore, are ill-suited for resolution on this case's current procedural posture. Further, there are inconsistencies in J.C.'s alleged facts. For example, while J.C. claims that Sequoia provided "no management services" to Christ Hospital, the SCI Report, which the Counterclaims incorporate by reference, states that "[a]though [the Founders] have provided services to the three [CarePoint Hospitals], the extent of the services . . . is

---

[100] Oral Arg. Tr. at 42:6–23.

25

unclear."[101] Thus, the court does not rely on the acquiescence doctrine to dismiss claims based on the Sequoia Fees.

Turning back to laches, the Sequoia Fees form the basis of parts of Count I (breach of contract), Count II (breach of fiduciary duty), Count IV (breach of the implied covenant), Count VII (waste), and Count IX (fraud). Each of these causes of action is subject to Delaware's three-year statute of limitations.[102]

The equitable doctrine of laches "prevent[s] someone who slumbers on her rights and delays unreasonably in filing suit from being permitted to prosecute her claims."[103] "While laches is a standalone doctrine, 'equity follows the law and in appropriate circumstances will apply a statute of limitations by analogy.'"[104] "A filing after the expiration of the analogous limitations period is presumptively an unreasonable delay for purposes of laches."[105]

"Absent a tolling of the limitations period, a party's failure to file within the analogous period of limitations will be given great weight in deciding whether the claims

---

[101] SACC ¶ 6; SCI Report at 6.

[102] 10 *Del. C.* § 8106; 10 *Del. C.* § 8112; *see Homsey Architects, Inc. v. Nine Ninety Nine, LLC*, 2010 WL 2476298, at *8 (Del. Ch. June 14, 2010) (breach of contract and breach of the implied covenant of good faith and fair dealing); *Vichi v. Koninklijke Philips Elecs. NV*, 2009 WL 4345724, at *15 (Del. Ch. Dec. 1, 2009) (breach of fiduciary duty and fraud); *Weiss v. Swanson*, 948 A.2d 433, 450–51 (Del. 2008) (waste).

[103] *TrustCo Bank v. Mathews*, 2015 WL 295373, at *5 (Del. Ch. Jan. 22, 2015).

[104] *Largo Legacy Gp., LLC v. Charles*, 2021 WL 2692426, at *9 (Del. Ch. June 30, 2021) (quoting *In re Tyson Foods, Inc. Consol. S'holder Litig.*, 919 A.2d 563, 584 (Del. Ch. 2007) (brackets omitted)).

[105] *Levey v. Brownstone Asset Mgmt., LP*, 76 A.3d 764, 769 (Del. 2013).

26

are barred by laches."[106] "The Delaware courts recognize three doctrines that may toll the statute of limitations: (1) inherently unknowable injuries, (2) fraudulent concealment, and (3) equitable tolling following a breach of fiduciary duties."[107] In addition, "[i]f there is a continuing wrong, the cause of action is timely so long as the last act evidencing the continuing wrong falls within the limitations period.[108] "To plead a continuing wrong, the plaintiff must allege that the various acts are 'so inexorably intertwined that there is but one continuing wrong.'"[109]

When deciding a motion under Rule 12(b)(6), "the Court is generally limited to facts appearing on the face of the pleadings," and therefore, "affirmative defenses, such as laches, are not ordinarily well-suited for treatment on such a motion" "[u]nless it is clear from the face of the complaint that an affirmative defense exists and that the plaintiff can prove no set of facts to avoid it."[110] At the motion to dismiss stage, the court applies a three-part analysis to determine whether a claim is barred by laches:

> From the pleadings, the Court determines (1) the date of accrual of the cause of action based on the allegations, (2) if the plaintiff has pleaded facts sufficient to create a reasonable inference that the statute of limitations has been tolled, and (3) assuming a tolling exception has been

---

[106] *Whittington v. Dragon Gp., L.L.C.*, 991 A.2d 1, 9 (Del. 2009).

[107] *Vichi*, 2009 WL 4345724, at *17.

[108] *Kerns v. Dukes*, 2004 WL 766529, at *4 (Del. Ch. Apr. 2, 2004).

[109] *Frederick Hsu Living Tr. v. ODN Hldg. Corp.*, 2017 WL 1437308, at *43 (Del. Ch. Apr. 14, 2017) (quoting *Ewing v. Beck*, 520 A.2d 653, 662 (Del. 1987)).

[110] *Reid v. Spazio*, 970 A.2d 176, 183 (Del. 2009).

pleaded adequately, when the plaintiff was on inquiry
notice of a claim based on the allegations.[111]

J.C. filed its original Counterclaims on January 15, 2020, and as described above, each of the causes of action arising out of the Sequoia Fees carries a three-year statute of limitations.[112] Thus, claims arising out of the Sequoia Fees that accrued before January 15, 2017, are presumptively time-barred unless a tolling doctrine applies.

Defendants argue that the claims accrued on July 13, 2012, when CH Holdco's and Hudson Opco's Operating Agreements, the Sequoia Management Agreement, and the CH Holdco Management Agreement were executed. As discussed above, the Key Terms attached to both CH Holdco's and Hudson Opco's Operating Agreements authorized the entities to enter into a management agreement with Sequoia Management to pay a monthly management fee.[113]

J.C. effectively concedes that the causes of action related to the Sequoia Fees first arose on July 13, 2012, the date these documents established Sequoia's management fee payment structure. J.C. argues, however, that because the Sequoia Fees have been paid continuously since 2012, they constitute a continuing wrong and therefore are not barred by laches.

---

[111] *Winner Acceptance Corp. v. Return on Cap. Corp.*, 2008 WL 5352063, at \*14 (Del. Ch. Dec. 23, 2008).

[112] Dkt. 77.

[113] *See* Key Terms § 10.

Chancellor Allen's decision in *Kahn v. Seaboard Corp.* is directly on point.[114]  In *Seaboard*, a stockholder plaintiff filed a derivative suit against Seaboard's board of directors in 1990, challenging the board's decision to enter into agreements in 1986 with an entity controlled by two of the directors.[115]  Under the agreements, Seaboard's wholly owned subsidiary paid the counterparty millions of dollars in management fees.  The plaintiff alleged that these contracts benefited the directors and the counterparty at Seaboard's expense.  Seaboard executed the contract at issue outside of the limitations period, but the plaintiff argued that the continued payment of the management fees constituted a continuing wrong.[116]

Chancellor Allen rejected the plaintiff's continuing-wrong arguments and dismissed the claims on grounds of laches.  He reasoned that:

> The wrong attempted to be alleged is the use of control over Seaboard to require it to enter into a contract that was detrimental to it and beneficial, indirectly, to the defendants. Any such wrong occurred at the time that enforceable legal rights against Seaboard were created. Suit could have been brought immediately thereafter to rescind the contract and for nominal damages which are traditionally available in contract actions. Complete and adequate relief, if justified, could be shaped immediately or at any point thereafter.[117]

---

[114] 625 A.2d 269 (Del. Ch. 1993).

[115] *Id.* at 270.

[116] *Id.* at 270–71.

[117] *Id.* at 271.

As far as the court was concerned, the "continuing wrong" alleged was mere performance of a contract:

> It is implicitly admitted that payments were made by Seaboard as provided in the contract. There is no claim that payments in excess of those contemplated by the [contract] have been made. So long as the [contract] is not rescinded, the payments it calls for are legal obligations, not wrongs. Thus, unlike a continuing wrong the only liability matter to be litigated involves defendants' 1986 actions in authorizing the creation of these contract rights and liabilities.[118]

So too here. J.C. does not allege that Hudson Opco has paid Sequoia more in management fees than was originally contemplated in the Key Terms or the Sequoia Management Agreement. J.C. contests the propriety of the Sequoia Fees, but the fees are contractual obligations like those at issue in *Seaboard*. The wrong alleged here is the entry into the relevant contracts, which occurred on July 13, 2012. The continuing wrong exception therefore does not apply to claims arising out of the Sequoia Fees.

In the alternative, J.C. argues that the otherwise-applicable limitations period was tolled until the SCI Report's 2019 release under the doctrine of equitable tolling, which "stops the statute from running while a plaintiff has reasonably relied upon the competence and good faith of a fiduciary."[119] Although no evidence of actual concealment is necessary to plead equitable tolling, the statute is only tolled until the plaintiff "investor knew or had

---

[118] *Id.*

[119] *Tyson Foods*, 919 A.2d at 585.

30

reason to know of the facts constituting the wrong."[120]  J.C. argues that the limitations period for claims arising out of the Sequoia Fees should be equitably tolled because it "relied on Hudson Holdco to discharge its fiduciary duties as the manager of CH Holdco and Hudson Opco in good faith and in the best interest of Hudson Opco and CH Holdco."[121]

In a footnote, J.C. argues that the tolling doctrine of "inherently unknowable injuries," which is also known as the "time of discovery" rule, similarly tolls the limitations period "for the same reason[]" that equitable tolling does.[122]  Under that doctrine, the limitations period "will not run where it would be practically impossible for a plaintiff to discover the existence of a cause of action," as long as the plaintiff is "'blamelessly ignorant' of both the wrongful act and the resulting harm."[123]

Vice Chancellor Slights' August and November 2016 decisions in *AM General Holdings LLC v. The Renco Group, Inc.* are directly on point.[124]  There, the plaintiff LLC member alleged that the managing member had improperly manipulated the LLC's member-distribution scheme by intentionally driving down one of the LLC's subsidiary's profits.[125]  The scheme involved three components: (i) charging the subsidiary unauthorized management fees and royalties; (ii) charging engineering, research, and

---

[120] *In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *6 (Del. Ch. July 17, 1998).

[121] J.C.'s Answering Br. at 25–26.

[122] *Id.* at 26 n.10.

[123] *Tyson Foods*, 919 A.2d at 584–85.

[124] *See AM Gen. Hldgs. LLC v. The Renco Gp., Inc.*, 2016 WL 4440476 (Del. Ch. Aug 22, 2016) [hereinafter "*Renco I*"]; *AM Gen. Hldgs. LLC v. The Renco Gp., Inc.*, 2016 WL 6648728 (Del. Ch. Nov. 10, 2016) [hereinafter "*Renco II*"].

[125] *Renco I*, 2016 WL 4440476 at *4.

31

development costs to the subsidiary that were unrelated to a particular product, 100% of the profits from which were allocated to the plaintiff; and (iii) causing the subsidiary to charge the managing member unjustifiably low prices for its products.[126] The underlying conduct began six to eight years before the original complaint was filed and thus the plaintiff's claims were presumptively time-barred.[127]

The Vice Chancellor rejected the plaintiff's inherently-unknowable-injury argument in the August decision because the plaintiff had information rights under the LLC Agreement. The plaintiff alleged that the LLC's managing member had "repeatedly denied" the plaintiff's requests for information, but the plaintiff failed to take timely action to enforce those rights.[128] The Vice Chancellor reasoned that "at the moment [the managing member] refused [the plaintiff's] demands that it provide information as required by the [LLC] Agreement," the plaintiff "no longer could assume 'blamelessly ignorant' status for purposes of invoking the time of discovery tolling exception."[129]

The Vice Chancellor also rejected the plaintiff's equitable tolling arguments. In the August decision, the court rejected the plaintiff's equitable tolling argument on the grounds that the LLC Agreement altered the managing member's fiduciary duties such that equitable tolling due to a fiduciary relationship did not apply.[130] The plaintiff moved to

---

[126] *Id.*

[127] *Id.* at *6.

[128] *Id.* at *15.

[129] *Id.*

[130] *Id.* at *15–16.

"amend" this aspect of the August decision, arguing that equitable tolling can also be based on a contractual relationship, which the Vice Chancellor rejected in the November decision. The Vice Chancellor clarified that "having concluded that the alleged injury was not inherently unknowable as a matter of undisputed fact, and that [the LLC member] was not 'blamelessly ignorant,'" the court remained "satisfied that [the LLC member] cannot avail itself of equitable tolling regardless of whether it bases its supposed reliance on a fiduciary or contractual relationship with [the managing member]."[131]

As in *Renco*, the governing agreements provide broad information rights. The Counterclaims allege that J.C. made multiple demands for information on CH Holdco and Hudson Opco "[f]rom 2013 to the present," and that Defendants obstructed J.C.'s rights "[o]n each and every occasion."[132] Under the *Renco* decisions, once Hudson Holdco refused J.C.'s books and records requests in 2013, J.C. ceased being "blamelessly ignorant" of the challenged misconduct for purposes of invoking the tolling doctrines on which it attempts to rely and had until, at the latest, 2016 to file claims related to the Sequoia Fees.[133]

---

[131] *Renco II*, 2016 WL 6648728 at *2.

[132] SACC ¶ 68.

[133] The facts here are stronger than in *Renco*. As discussed above, the Key Terms contractually entitled J.C.'s principal, Eisenreich, to receive a portion of the Sequoia Fees until the Palisades Loans were paid off. If Eisenreich received his allotment, J.C. should have known that the Sequoia Fees were not purely management fees paid in exchange for management services rendered. If Eisenreich did not receive his allotment, J.C. had the information rights necessary to ascertain where the Sequoia Fees were going and what Christ Hospital was receiving in return.

Thus, the Counterclaims arising out of the Sequoia Fees are dismissed as time-barred.[134]

### 2. The Counterclaims Challenging The Retention Of CP Management Fail To State A Claim.

J.C. claims, under a variety of legal theories, that Defendants are liable for the retention of and payment of fees to CP Management pursuant to the CP Agreement, which J.C. characterizes as a "duplicate management services agreement[]."[135] These facts form the basis of parts of Count I (breach of contract), Count IV (breach of the implied covenant), Count VII (waste), and Count IX (fraud).

In support of Count I for breach of contract, J.C. alleges that Hudson Holdco breached CH Holdco's and Hudson Opco's Operating Agreements "by concealing from Plaintiff the scheme to embezzle from Christ Hospital fictitious management fees and allocations, and by the other acts of misconduct described in these [Counterclaims]."[136] Specifically, J.C. alleges that Hudson Holdco breached Section 6.5 of CH Holdco's and Hudson Opco's Operating Agreements by failing "to discharge its duties as a manager in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner it reasonably believes to be in the best interest of CH Holdco and Hudson Opco . . . ."[137]

---

[134] Therefore, the court need not address the parties' arguments with regard to Court of Chancery Rule 9(b).

[135] *E.g.*, SACC ¶ 12.

[136] *Id.* ¶ 153.

[137] *Id.*

34

In addition, J.C. alleges that Hudson Holdco breached Section 6.2(b)(vii) of CH Holdco's Operating Agreement, which provides that "[a]ny modification" of the CH Holdco Management Agreement constitutes a "fundamental transaction[]" requiring the approval of at least 80% of CH Holdco's Members.[138] While J.C. does not allege that Hudson Holdco modified the CH Holdco Management Agreement, it contends that "Hudson Holdco deprived and rendered meaningless" J.C.'s "right to approve any change or modification to the provisions in the CH Holdco Management Agreement regarding the payments of [Christ] Hospital's net income to CH Holdco or other decisions or actions affecting such payments pursuant to Section 6.2(b)(vii) of the CH Holdco Operating Agreement."[139]

In support of Count IV for breach of the implied covenant of good faith and fair dealing, J.C. alleges that Hudson Holdco caused Hudson Opco "to enter into duplicate management services agreements with Sequoia Healthcare and [CP Management], to pay more than $30 million of fictitious and duplicative management fees and allocations for the" Founders' benefit, and to "fraudulently conceal[] its conduct from [J.C.], which constituted self-dealing, embezzlement, and misleading or deceptive conduct."[140]

In support of Count VII for waste, J.C. alleges that Hudson Holdco and the Founders authorized "duplicate management services agreements and the payment of fictitious management fees under the bogus management services agreement between Hudson Opco

---

[138] CH Holdco Operating Agreement § 6.2(b)(vii).

[139] SACC ¶ 154.

[140] *Id.* ¶ 173.

35

and Sequoia," which "is so one-sided that no business person of ordinary sound judgment could conclude that Hudson Opco received adequate consideration."[141]

In support of Count IX for fraud, J.C. alleges that Hudson Holdco and the Founders made "material misrepresentations and omissions that have harmed and continue to harm" J.C., including by:

- Preparing and distributing to [J.C.] financial statements for Christ Hospital that do not disclose the existence of the [CP Management] contracts or the fact that [Sequoia] has no employees or operating expenses and is not providing management services to Christ Hospital; and

- For years, Defendants actively misrepresented and concealed facts and lied to [J.C.] upon being asked specific questions about the financials and financial statements of Christ Hospital in order to throw [J.C.] off of the scent of their fraud. They also deliberately prevented [J.C.] from seeing those same financials in any timely manner to stop [J.C.] from discovering their pervasive and continuing fraud.[142]

Once the claims based on the Sequoia Fees, which are time-barred, are removed from the claims about the retention of and payment of fees to CP Management, it becomes clear that the claims about CP Management fail to state a claim. Each alleged cause of action includes detriment to an injured party as an essential element, but J.C. alleges no injury related to the retention of or payment of fees to CP Management.[143]

---

[141] *Id.* ¶ 188.

[142] *Id.* ¶ 197.

[143] *See VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003) ("In order to survive a motion to dismiss for failure to state a breach of contract claim, the plaintiff must demonstrate: first, the existence of the contract, whether express or implied; second, the breach of an obligation imposed by that contract; and third, *the resultant damage to the plaintiff*.") (emphasis added); *Fitzgerald v. Cantor*, 1998 WL 842316, at *1 (Del. Ch. Nov. 10, 1998) ("In order to plead successfully a breach of an implied covenant of good faith

Rather, any alleged injury is based on the Sequoia Fees, not the fees that CP Management was being paid for its services. The Counterclaims allege that CP Management "was actually providing and being paid for" "the management services" that Sequoia agreed to provide under the Sequoia Management Agreement.[144] Indeed, the Counterclaims aver that "unlike . . . [Sequoia], [CP Management] employs hundreds – a total of 377 people were on its payroll in 2016 – and paid more than $30 million in salaries and wages in 2016."[145]

---

and fair dealing, the plaintiff must allege a specific implied contractual obligation, a breach of that obligation by the defendant, and *resulting damage to the plaintiff*.") (emphasis added); *Apple Comput., Inc. v. Exponential Tech., Inc.*, 1999 WL 39547, at *11 (Del. Ch. Jan. 21, 1999) ("A claim of waste requires . . . . the Court to determine whether the corporation has bestowed an asset upon another in exchange for something *so inadequate in value* that no person of ordinary, sound business judgment would deem it worth that which *the corporation has paid*.") (emphasis added); *Latesco, L.P. v. Wayport, Inc.*, 2009 WL 2246793, at *8 (Del. Ch. July 24, 2009) ("The elements of common law fraud are: 1) a false representation, usually one of fact, made by the defendant; 2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; 3) an intent to induce the plaintiff to act or to refrain from acting; 4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and 5) *damage to the plaintiff as a result of such reliance*." (quoting *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983)) (emphasis added). To the extent that the breach of contract claim would require the application of New Jersey law under the relevant contracts, New Jersey law is the same. *See Globe Motor Co. v. Igdalev*, 139 A.3d 57, 64 (N.J. 2016) ("Our law imposes on a plaintiff the burden to prove four elements: first, that the parties entered into a contract containing certain terms; second, that plaintiffs did what the contract required them to do; third, that defendants did not do what the contract required them to do, defined as a breach of the contract; and fourth, that *defendants' breach, or failure to do what the contract required, caused a loss to the plaintiffs*." (cleaned up)) (emphasis added).

[144] SACC ¶ 12.

[145] *Id.* ¶ 76.

J.C. appears to argue that paying CP Management pursuant to the CP Agreement constitutes a constructive modification of the CH Holdco Management Agreement in violation of its right to approve such modifications under Section 6.2(b)(vii) of CH Holdco's Operating Agreement.[146]

Under the CH Holdco Management Agreement, Hudson Opco agreed to pay CH Holdco "a management fee equal to the lesser of (a) ninety-five percent (95%) of [Hudson Opco]'s net income, or (b) the amount minimally necessary for [Hudson] Opco to maintain its debt covenant ratios with its lenders."[147]

J.C. does not allege that this structure has been changed, but rather seems to argue that paying CP Management for its services effectively reduces Christ Hospital's net income and thus the fees CH Holdco receives from Christ Hospital, thereby lowering the amount that J.C. receives in distributions as a Member of CH Holdco.[148]

This is not a breach. CH Holdco's Operating Agreement expressly authorizes Hudson Holdco "[t]o take such actions and incur such expense on behalf of [CH Holdco] as may be necessary or advisable in connection with the conduct of the affairs of" CH Holdco[149] and "[t]o enter into, make and perform such contracts, agreements and other undertakings as may be deemed necessary or advisable for the conduct of the affairs of"

---

[146] *Id.* ¶¶ 154–55.

[147] CH Holdco Mgmt. Agreement § 5.

[148] *See* J.C.'s Answering Br. at 35–36.

[149] CH Holdco Operating Agreement § 6.2(a)(iii).

CH Holdco.[150]  The CP Agreement appears to be one such authorized contract, and J.C. does not allege that CP Management's services have failed to meet its obligations under that contract or any other injury caused by the retention of CP Management.

Thus, the Counterclaims challenging the retention of and payment of fees to CP Management fail to state a claim upon which relief can be granted and are dismissed on that basis.

### 3. The Counterclaims Challenging The Sequoia Loan And The Establishment Of Clover Fail To State A Claim.

J.C. claims, under a variety of legal theories, that Defendants are liable for the Sequoia Loan and the formation of Clover, which it characterizes as a "scheme to divert funds away from Hudson Opco . . . , C.H. Holdco and J.C." because J.C. does not have an interest in Clover.[151]  These facts form the basis of Count XII (usurpation of corporate opportunity), Count XIII (unjust enrichment), and Count X (civil conspiracy).  Defendants argue that each Count fails to state a claim.

In Count XII, J.C. alleges that the Founders usurped a corporate opportunity by creating Clover, because:

> CH Holdco and the CarePoint Hospitals generally could have organized and operated a provider-sponsored plan that, unlike Clover, redounded to the benefit of all of the investors in the CarePoint Hospitals.  CH Holdco and the CarePoint Hospitals had the ability and the interest to create such a provider-sponsored plan, which was within CH Holdco and the CarePoint Hospitals' line of business.  Further, the [Founders]' arrogation of Clover to their

---

[150] *Id.* § 6.2(a)(vi).

[151] SACC ¶ 203.

control caused these [Founders]—who control both Clover and the CarePoint Hospitals—to be placed in a position inimicable to the [Founders]' controlling role in CH Holdco and the CarePoint Hospitals, since Clover's economic interests run counter to that of CH Holdco and the CarePoint Hospitals.[152]

Defendants argue that CH Holdco's and Hudson Opco's Operating Agreements foreclose the claims for usurpation of corporate opportunity. Section 6.4 of each provides:

The Manager or any Member and any of their respective controlling persons or Affiliates may engage in or possess an interest in other business ventures or investments of any kind, independently or with others, including but not limited to ventures engaged in owning, operating or managing businesses or properties similar to those businesses or properties owned or operated by the Company. *The fact that the Manager, any Member or any controlling person or Affiliate thereof may avail itself of such opportunities*, either by itself or with other persons, including persons in which it has an interest, and not offer such opportunities to the Company or to the Manager or any Member as applicable, *shall not subject the Manager, such Member or such controlling person or Affiliate thereof to liability to the Company or to the Manager or any Member as applicable on account of lost opportunity*. Neither the Company nor the Manager nor any Member of controlling person thereof shall have any right by virtue of this Agreement or the relationship created hereby in or to such opportunities, or to the income or profits derived therefrom, and *the pursuit of such opportunities, even though competitive with the business of the Company, shall not be deemed wrongful or improper or in violation of this Agreement*.[153]

---

[152] *Id.* ¶ 222.

[153] CH Holdco Operating Agreement § 6.4 (emphasis added); Hudson Opco Operating Agreement § 6.4 (emphasis added).

40

J.C. argues in response that Hudson Holdco is required under Section 6.5 of the Operating Agreements to act in good faith and in the best interest of CH Holdco and Hudson Opco, and not to engage in willful misconduct or gross negligence.[154]

Under well-established rules of contract interpretation, however, "specific words limit the 'meaning of general words if it appears from the whole agreement that the parties' purpose was directed solely toward the matter to which the specific words or clause relate.'"[155] Although Hudson Holdco was generally required to act in good faith and in the best interests of CH Holdco and Hudson Opco, the Operating Agreements specifically permit the pursuit of corporate opportunities alleged here.

In Count XIII, J.C. alleges that the Founders were unjustly enriched "by causing the CarePoint Hospitals to assist in the founding of Clover absent adequate compensation."[156]

In order to plead unjust enrichment, a party must demonstrate "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law."[157]

The Counterclaims fail to plead, at the least, the existence of an enrichment, an impoverishment, or a relationship between the two with respect to the Sequoia Loan or the establishment of Clover. Rather, they plead that Sequoia took out a loan using the revenue

---

[154] J.C.'s Answering Br. at 46–47 n.17; *see* CH Holdco Operating Agreement § 6.5; Hudson Opco Operating Agreement § 6.5.

[155] *In re IAC/Interactive Corp.*, 948 A.2d 471, 496 (Del. Ch. 2008) (quoting 11 Williston On Contracts § 32:10 (4th ed. 1999)).

[156] SACC ¶ 226.

[157] *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010).

it receives from the Hospitals pursuant to its management contracts as collateral, that the loan proceeds were used in part to pay off intercompany debt and establish Clover, and that entities associated with the Founders guaranteed that the Sequoia Loan would be repaid.

J.C. argues that these facts demonstrate that "the CarePoint Hospitals . . . served as the backstop" for the Sequoia Loan and that the Founders "misappropriated funds from the CarePoint Hospitals . . . in order to establish Clover."[158]

They do not. They establish that entities associated with the Founders were the "backstop" for the Sequoia Loan as its guarantors, and that Sequoia, an entity in which J.C. does not have an interest, received the Sequoia Loan from an independent bank and distributed the proceeds as it saw fit. These facts do not state a claim for unjust enrichment upon which relief can be granted.

In Count X, J.C. claims that the Founders and Sequoia engaged in a civil conspiracy to use proceeds from the Sequoia Loan "to launch Clover (a Delaware entity) as a company, to the detriment of the CarePoint Hospitals and their minority partners with fraudulent intent."[159] J.C. alleges that the Sequoia Loan "had no good-faith business purpose, and constitutes self-dealing by the [Founders] and their controlled entities," in part because the Founders and Sequoia received proceeds from the Sequoia Loan.[160] According to J.C., "[t]he point of the conspiracy was to misdirect funds from CH Holdco (of which [J.C.]

---

[158] SACC ¶¶ 123–24.

[159] *Id.* ¶ 202.

[160] *Id.* ¶¶ 204–05.

owns 25%) to entities owned and controlled by the [Founders], to the detriment of [J.C.]."[161]

"[T]o state a claim for civil conspiracy, a plaintiff must plead facts supporting (1) the existence of a confederation or combination of two or more persons; (2) that an unlawful act was done in furtherance of the conspiracy; and (3) that the conspirators caused actual damage to the plaintiff."[162] "Civil conspiracy is not an independent cause of action; it must be predicated on an underlying wrong. Thus, if plaintiff fails to adequately allege the elements of the underlying claim, the conspiracy claim must be dismissed."[163]

The civil conspiracy claim arising out of the Sequoia Loan and the establishment founders on, at least, the requirement of an underlying wrong. Having held that the Sequoia Loan and the establishment of Clover fail to support claims for unjust enrichment or usurpation of corporate opportunity, the civil conspiracy claim arising out of those events must fail as well.

Thus, the Counterclaims arising out of the Sequoia Loan and the establishment of Clover fail to state a claim upon which relief can be granted and are dismissed on that basis. The court therefore does not address whether another theory, such as time-barring, could independently operate to foreclose such claims.

---

[161] *Id.* ¶ 207.

[162] *Allied Cap. Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1036 (Del. Ch. 2006).

[163] *Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 892 (Del. Ch. 2009).

### 4. The Counterclaims Challenging The Clover Benefits Fail To State A Claim.

J.C. claims, under a variety of legal theories, that Defendants are liable for the Clover Benefits, which J.C. characterizes as a plot "to misdirect funds from CH Holdco (of which [J.C.] owns 25%) to entities owned and controlled by the" Founders.[164] These allegations form the basis of Count XI (civil conspiracy), Count XIV (tortious interference with prospective economic advantage), and parts of Count II (breach of fiduciary duty), Count VII (waste), Count XII (usurpation of corporate opportunity), and Count XIII (unjust enrichment).

With regard to the Clover Benefits, J.C. claims that, upon "information and belief": (i) "Clover contracted with the CarePoint Hospitals at a significantly reduced rate for medical services that were provided to Clover members," which "diverted funds from the CarePoint Hospitals, and its minority partners, to the benefit of Clover;" (ii) "Garipalli caused Clover to issue automatic denials for claims for medical services performed by the CarePoint Hospitals," which "had the effect of causing the CarePoint Hospitals to expend additional effort in order to collect monies rightfully owed by Clover;" and (iii) "the CarePoint Hospitals did not seek to collect a significant amount of the monies owed by Clover to the CarePoint Hospitals," "despite the fact that Sequoia . . . was responsible for ensuring that Christ and Hoboken Hospitals collected all monies owed . . . ."[165]

---

[164] SACC ¶ 216.

[165] *Id.* ¶¶ 132–34, 136.

44

Defendants argue that these allegations are not pled with sufficient particularity under this court's rules. Court of Chancery Rule 8(a) requires a pleading to contain "a short and plain statement of the claim showing that the pleader is entitled to relief."[166] "When a complaint fails to do so, it must be dismissed under Rule 12(b)(6)."[167] "Notwithstanding Delaware's permissive pleading standard," the court may "disregard mere conclusory allegations made without specific allegations of fact to support them."[168] "Pleading serial facts 'on information and belief' is no substitute for well-pled facts that will support a reasonable inference of wrongdoing."[169]

Chancellor Chandler's decision in *Monroe County Employees' Retirement System v. Carlson* is instructive.[170] In *Monroe*, the plaintiff stockholder filed a derivative action accusing the nominal defendant's board and controlling stockholder of breaches of fiduciary duty in connection with transactions carried out under a contract between the nominal defendant and the controller.[171] Despite the fact that the parties agreed that the entire fairness standard of review applied to any transactions arising out the contract, the plaintiff made factual allegations concerning unfair dealing, but did not plead specific facts "geared towards proving that the . . . transactions were executed at an unfair price."[172]

---

[166] Ct. Ch. R. 8(a).

[167] *In re Coca-Cola Enters., Inc.*, 2007 WL 3122370, at *3 (Del. Ch. Oct. 17, 2007).

[168] *O'Reilly v. Transworld Healthcare, Inc.*, 745 A.2d 902, 912 (Del. Ch. 1999).

[169] *In re Xura, Inc. S'holder Litig.*, 2019 WL 3063599, at *3 (Del. Ch. July 12, 2019).

[170] 2010 WL 2376890 (Del. Ch. June 7, 2010).

[171] *Id.* at *1.

[172] *Id.* at *2.

The court observed:

> As to price, the complaint cites the amounts [the nominal defendant] paid to [the controller] and makes the conclusory assertion that those amounts were unfair, but makes no factual allegations about those amounts to put them into perspective. For example, the complaint does not allege that [the nominal defendant] could obtain services at a better price elsewhere. Nor does the complaint allege anything about what [the controller]'s services are worth relative to the price [the nominal defendant] paid. Thus, even if plaintiff's factual allegations prove unfair dealing, the complaint posits no basis for concluding that the [transactions under the contract] were priced unfairly.[173]

The court therefore dismissed the plaintiff's claims for failure to state a claim upon which relief can be granted.[174] Further, because the plaintiff in *Monroe* "chose to stand on its complaint in response to defendants' motions to dismiss rather than seek leave to amend its complaint this case is dismissed with prejudice."[175]

*Monroe* compels dismissal here. J.C.'s allegations regarding the Clover Benefits, which are pled entirely "on information and belief," are even less informative than the allegations at issue in *Monroe*, which cited the prices paid in the challenged transactions. J.C. does not allege: (i) the rates at which Clover and the CarePoint Hospitals contracted; (ii) a comparison to rates Clover charges other hospitals; (iii) a comparison to rates that the Hospitals have with other insurance providers; (iv) how much money the CarePoint

---

[173] *Id.*

[174] *Id.*

[175] *Id.*

Hospitals failed to collect from Clover; or even (v) when any of the wrongdoing with respect to the Clover Benefits took place. Nothing.

J.C. argues that *Monroe* is inapposite because it was decided in the context of entire fairness transactions, but the entire fairness standard of review does not raise the pleading standard required by Rule 8(a) or Rule 12(b)(6). Thus, the Counterclaims arising out of the Clover Benefits fail to state a claim upon which relief can be granted under Rules 8(a) and 12(b)(6) and are dismissed on that basis.

## B.     The Court Lacks Personal Jurisdiction Over Sequoia

Sequoia has moved to dismiss the Counterclaims against it based on lack of personal jurisdiction pursuant to Court of Chancery Rule 12(b)(2). The only counts brought against Sequoia are Count III (aiding and abetting breach of fiduciary duty), Count VI (aiding and abetting conversion), Count VIII (aiding and abetting waste), and Count X (civil conspiracy).

When a party "moves to dismiss a complaint pursuant to Court of Chancery Rule 12(b)(2)," the claimant "bears the burden of showing a basis for the court's exercise of jurisdiction over the [movant]."[176] "In ruling on a 12(b)(2) motion, the court may consider the pleadings, affidavits, and any discovery of record," but where "no evidentiary hearing

---

[176] *Ryan v. Gifford*, 935 A.2d 258, 265 (Del. Ch. 2007) (citing *Werner v. Miller Tech. Mgmt., L.P.*, 831 A.2d 318 (Del. Ch. 2003))

has been held, plaintiffs need only make a *prima facie* showing of personal jurisdiction" on a record construed "in the light most favorable to the [claimant]."[177]

Delaware courts use a two-step analysis to resolve questions of personal jurisdiction.[178] First, the court must "determine that service of process is authorized by statute."[179] Second, the defendant must have certain minimum contacts with Delaware such that the exercise of personal jurisdiction "does not offend traditional notions of fair play and substantial justice."[180]

J.C. argues that this court has personal jurisdiction over Sequoia under Delaware's Long-Arm Statute based on the conspiracy theory of jurisdiction.

Delaware's Long-Arm Statute provides jurisdiction over a nonresident "who in person or through an agent . . . [t]ransacts any business or performs any character of work or service in the State . . . [or] [c]auses tortious injury in the State by an act or omission in this State."[181] "[A] single transaction is sufficient to confer jurisdiction where the claim is

---

[177] *Focus Fin. P'rs, LLC v. Holsopple*, 241 A.3d 784, 800–01 (Del. Ch. 2020) (quoting *Ryan*, 935 A.2d at 265).

[178] *See Ryan*, 935 A.2d at 265.

[179] *Id.*

[180] *Matthew v. FläktWoods Gp. SA*, 56 A.3d 1023, 1027 (Del. 2012) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotation marks omitted)).

[181] 10 *Del. C.* § 3104(c).

based on that transaction."[182] "Under the plain language of the Long-Arm Statute, forum-directed activity can be accomplished 'through an agent.'"[183]

The Delaware Supreme Court has adopted the conspiracy theory of jurisdiction, under which a person's co-conspirators are their agents, such that forum-directed activities by the co-conspirator can give rise to personal jurisdiction over all conspiracy members.[184] At the pleading stage, a plaintiff need not "produce direct evidence of a conspiracy" but must assert "specific facts from which one can reasonably infer that a conspiracy existed."[185]

The Delaware Supreme Court established the elements of the conspiracy theory of jurisdiction in *Istituto Bancario Italiano SpA v. Hunter Engineering Co.*:

> [A] conspirator who is absent from the forum state is subject to the jurisdiction of the court . . . if the plaintiff can make a factual showing that: (1) a conspiracy . . . existed; (2) the defendant was a member of that conspiracy; (3) a substantial act or substantial effect in furtherance of the conspiracy occurred in the forum state; (4) the defendant knew or had reason to know of the act in the forum state or that acts outside the forum state would have an effect in the forum state; and (5) the act in, or

---

[182] *Crescent/Mach I P'rs, L.P. v. Turner*, 846 A.2d 963, 978 (Del. Ch. 2000) (quoting *Kahn v. Lynch Commc'n Sys., Inc.*, 1989 WL 99800, at *4 (Del. Ch. Aug. 24, 1989) (quotation marks omitted)).

[183] *Virtus Cap. L.P. v. Eastman Chem. Co.*, 2015 WL 580553, at *11 (Del. Ch. Feb. 11, 2015) (quoting 10 *Del. C.* § 3104(c)).

[184] *See Istituto Bancario Italiano SpA v. Hunter Eng'g Co., Inc.*, 449 A.2d 210, 225 (Del. 1982).

[185] *Reid v. Siniscalchi*, 2014 WL 6589342, at *6 (Del. Ch. Nov. 20, 2014).

effect on, the forum state was a direct and foreseeable result of the conduct in furtherance of the conspiracy.[186]

The five elements of the *Istituto Bancario* test "functionally encompass both prongs of the jurisdictional test."[187] "The first three . . . elements address the statutory prong . . . . The fourth and fifth . . . elements address the constitutional prong . . . ."[188]

In this case, J.C.'s theory of personal jurisdiction fails because J.C. has failed to adequately allege that a conspiracy existed. None of the Counterclaims state a claim. There is thus no basis for the court to exercise personal jurisdiction over Sequoia. The claims against Sequoia are dismissed under Rule 12(b)(2).[189]

## III. CONCLUSION

For the foregoing reasons, the motions to dismiss the Counterclaims are GRANTED with prejudice.

---

[186] *Perry v. Neupert*, 2019 WL 719000, at *22 (Del. Ch. Feb. 15, 2019) (quoting *Istituto Bancario*, 449 A.2d at 225).

[187] *Virtus*, 2015 WL 580553, at *12.

[188] *Id.*

[189] *See Boulden v. Albiorix, Inc.*, 2013 WL 396254, at *9 (Del. Ch. Jan. 31, 2013) (dismissing non-resident defendants for lack of personal jurisdiction because the plaintiff "failed to state a claim for fraud, and because the conspiracy to commit fraud claim must be predicated on an underlying wrong, [plaintiff]'s conspiracy to commit fraud claim must also fail").